**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B.,A MINOR<br><br>APPEAL OF: C.B., FATHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 1397 WDA 2022 |

Appeal from the Order Entered October 27, 2022
In the Court of Common Pleas of Jefferson County Civil Division at No(s): CP-33-DP-0000061-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., A MINOR<br><br>APPEAL OF: C.B., FATHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 1398 WDA 2022 |

Appeal from the Order Entered October 27, 2022
In the Court of Common Pleas of Jefferson County Criminal Division at No(s): CP-33-DP-0000062-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., A MINOR<br><br>APPEAL OF: C.B., FATHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA<br><br>No. 1399 WDA 2022 |

Appeal from the Order Entered October 27, 2022
In the Court of Common Pleas of Jefferson County Civil Division at No(s): CP-33-DP-0000063-2014

BEFORE: BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED: May 15, 2023**

C.B. (Father) appeals[1] from the permanency review orders entered in the Court of Common Pleas of Jefferson County (trial court) that changed the permanency goal for Cu.B. (age 14; d.o.b. January 2008), Ca.B (age 12; d.o.b. April 2010) and Ch.B. (age 10; d.o.b. August 2012) (collectively, the Children) to adoption, with legal custody remaining with the Jefferson County Children and Youth Services Agency (CYS) and physical custody remaining with their current placements, with a review in six months.[2] He argues that the trial court erred in changing the permanency goal where the record reflects he is in full compliance with the permanency plan and that he had made moderate progress in alleviating the circumstances that necessitated the original placement. We affirm.

This case has a long and complicated history, with the Children being adjudicated dependent several times, returning to Mother or Father's custody

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] C.F. (Mother) did not appear at the goal change hearing and has not appealed from the court's order.

[2] At the time of the hearing, Cu.B. was placed at the Group Home at Pathways Adolescent Center. Ca.B. and Ch.B. were in kinship care.

for a period and then being adjudicated dependent again. We include the following pertinent details we glean from our review of the record.

**I.**

**A.**

Mother and Father had been separated for nine years at the time of the subject permanency review hearing. (***See*** CYS Exhibit 13, Dr. Allen H. Ryen Bonding Assessment, 9/14/22, at 5).[3] Mother has a paramour, C.F., who lives with her. The Children were most recently adjudicated dependent on three separate dates: Cu.B. on June 25, 2020; Ca.B. on July 23, 2021; and Ch.B. on April 21, 2022.

CYS became involved with the Children's family in April 2008. (Between that time and when the Children were adjudicated dependent for the third time in July 2014, CYS had received ten referrals about the family, including physical abuse by Father and lack of medical care for the Children. On December 17, 2014, the court issued permanency review orders directing that legal custody remained with CYS and physical custody would be with Father. On March 26, 2015, the court terminated court supervision and the Children remained with Father.

[3] Dr. Ryen's report is erroneously dated 2021.

The next activity occurred on March 4, 2020, when the court granted an order for emergency protective custody of Ch.B. and Ca.B. due to allegations of Cu.B.'s sexual misconduct against Ca.B. and other children in the home.[4] On March 31, 2020, the court adjudicated Ca.B. and Ch.B. dependent, ordering that they remain in foster care. The court ordered Mother and Father to obtain mental health and drug and alcohol evaluations. Father was ordered to participate in an anger management program.

On May 1, 2020, the court granted CYS's request to have Ca.B. and Ch.B. returned to Mother over Father's objection.

**B.**

On June 26, 2020, CYS filed a dependency petition for Cu.B. in which it alleged that it had concerns about chronic lice, mental health issues, domestic violence, home conditions and sexually acting out. CYS had received a report of Cu.B. attempting to rape Ca.B. Ca.B. and Ch.B. were removed from Mother's home again. Cu.B was adjudicated dependent and was placed at Harborcreek Youth Residential Treatment Facility.

On April 30, 2021, Father was ordered to attend the FIT program through Project Point of Light and have no contact with Cu.B. On June 7, 2022, Cu.B. was moved from Harborcreek Youth to a foster home. On August

---

[4] It appears there were a total of six children in the home. Only three are the subject of this matter.

29, 2022, due to the foster parents' request, the court ordered that Cu.B. be moved to Pathways Adolescent Center. Cu.B. has continued to be dependent since the June 26, 2020 adjudication.

**C.**

On July 31, 2020, the court entered permanency review orders finding Mother and Father were moderately compliant with their permanency plans and ordering that the current placement plans were for Ca.B. and Ch.B. to remain with Mother, with a concurrent plan of adoption.[5] Father was ordered to have no contact with Ca.B and Ch.B. The court also ordered him to obtain a drug and alcohol and mental health evaluation, attend an anger management program and participate in the FIT program. Mother was ordered to obtain a mental health evaluation. The permanency plans remained the same for the remainder of the case with Father vacillating between being noncompliant, minimally, moderately and substantially compliant. Mother's level of compliance varied from minimally to moderately compliant.

---

[5] The comment to Rule 1608, permanency hearing, provides, in pertinent part that, "[e]very child should have a concurrent plan, which is a secondary plan to be pursued if the primary permanency plan for the child cannot be achieved. … Because of time requirements, the concurrent plan is to be in place so that permanency may be achieved in a timely manner." Pa. Juv. Ct. Rule 1608, *Cmt.*

On October 30, 2020, the court entered permanency review orders terminating its supervision of Ca.B and Ch.B. because they were living with Mother since the court's July 30, 2020 order and no longer dependent.

**D.**

On July 16, 2021, the court granted CYS's application for emergency protective custody of Ca.B. because he had been acting out aggressively and acting sexually inappropriately. CYS requested he be evaluated at Dubois Penn Highlands. On July 26, 2021, the court adjudicated Ca.B. dependent and ordered that he remain at Dubois Penn Highlands and, at his discharge, be placed in a group home. Ca.B. has remained dependent since July 16, 2021, moving from Dubois Penn Highlands to Pathways Adolescent Center, then George Junior Republic group home, and finally into foster care with B.J.C. and W.C.

The July 26, 2021 order also directed that Father was to have no contact with Ca.B. In addition to the continuing goals for Mother and Father, Mother's paramour, F.C., was ordered to participate in an anger management program.

On September 30, 2021, the trial court granted Father's motion to resume contact with Ca.B. at the discretion of his therapist. In the January 28, 2022, April 21, 2022 and July 25, 2022 permanency review orders, the court ordered that all contact between Father and both Cu.B. and Ca.B. be conducted based on the recommendation of their respective therapists. No recommendation was ever made.

Ca.B. has remained dependent since July 26, 2021.

**E.**

On April 5, 2022, CYS filed a dependency petition for Ch.B. Since the court's May 1, 2020 order, Ch.B. had lived with Mother and Mother's paramour, F.C., and had visitation with Father every other weekend. CYS was concerned about Mother's medical neglect of Ch.B. and about F.C.'s treatment of her. CYS requested that Ch.B. be placed with Father.

The court adjudicated her dependent on April 21, 2022, and placed her in kinship care with L.C. Thereafter, she was briefly in foster care and on June 27, 2022, Ch.B. was placed in kinship care with B.J.C. and W.C.

Ch.B.'s goal was reunification with her parent or guardian. Mother was offered supervised visitation, with Father continuing weekend visitation from Friday to Sunday.

In June 2022, CYS received a new CPS report regarding Father and requested that there be no contact between the Children and Father until a full investigation could be completed. The court granted the order the same day. Ultimately, the report was unfounded.

Ch.B. has been dependent since April 21, 2022.

**F.**

On October 4, 2022, CYS filed petitions for a permanency hearing to change the Children's goals to adoption. On October 13, 2022, the court suspended Mother's contact with the Children because of her failure to contact

Cu.B. since August 2022 and the fact that the Children all experienced behavioral issues after contact with her.

The permanency review hearing on the CYS petitions occurred on October 26, 2022.

**II.**

CYS casework supervisor Rebecca Sallack; Kyle Straub; Ca.B.'s foster mother, L.K.; and Ch.B.'s foster mother B.J.C. testified on behalf of CYS. Father and Nate Davis of Pathways Adolescent Center testified on Father's behalf.

**A.**

Rebecca Sallack testified that CYS has provided numerous services for the family over the life of the case trying to help them fix problems within the home and with the Children to keep the Children safe and bonded with their parents. She described Father's progress toward his goals as moderate. He has completed nurturing parenting and anger management classes and successfully completed drug and alcohol and mental health evaluations. He has an extensive drug history[6] but had drug and alcohol services and was still attending Narcotics Anonymous classes at the time of the hearing. At the time of the permanency review hearing, Father had not had any contact with the Children since June/July 2022. In August, Father asked Ms. Sallack about

---

[6] Father was briefly incarcerated from August 27, 2020, until March 1, 2021.

contact with the Children and she advised that he text her if he did not hear from her because of her schedule. He did not do so until two months later, on the Monday before the October goal change hearing, and at that time he was reminded that the standing order was that contact with Cu.B. and Ca.B. had to be at the recommendation of their therapists, and that they would wait until the hearing as far as Ch.B. since it just was a week away.

Mother's progress was minimal. The biggest concern with Mother is her inability to protect the Children from mistreatment by her paramour, F.C., who is abusive to the Children and has not completed an anger management program as directed by CYS to enable Mother to be reunited with them. Despite repeated talks with Mother about the need to get F.C. out of the house to achieve reunification, she is unwilling to do so. CYS was also concerned that she was not able to supervise more than one child at a time. At the time of the permanency review hearing, Mother was not participating in any court-ordered services. Previously, she participated in some outpatient therapy, family therapy and psychiatric services, and she completed nurturing parenting classes.

Ms. Sallack detailed the history with each of the Children, adding some detail and context to the foregoing procedural facts.

**1.**

At the time of the goal change hearing, Cu.B. was 14 years old and had been in care for 28 months. The evaluation from Harborcreek Youth showed

that Cu.B. had an extensive history of multiple hospitalizations, participated in a partial hospitalization program and was involved in family-based mental health on two occasions. Due to Cu.B.'s continued struggles regulating emotions and reaching treatment goals, Harborcreek Youth recommended that Cu.B. remain in residential treatment where he actively participates in his therapy. He is receiving intervention to enable him to identify his inappropriate sexual harming behaviors towards his siblings and to learn skills to reduce future risk of these behaviors. Mother's contact with Cu.B. did not start until September 2020, and her participation in his family therapy thereafter was inconsistent. She has not contacted him since August 2022.

Cu.B.'s only contact with Father in 28 months was two zoom interactions. After these contacts, Cu.B. would exhibit aggressive behaviors due to the trauma that was caused. In July 2021, he requested there be no further contact with Father so that he "could process through his trauma history," much of which was caused by Father's abuse. (CYS Exhibit 3, Harborcreek Report, 10/08/21, at 3); (N.T., 10/26/22, at 16). It was because of this request that the court ordered that contact occur at the direction and recommendation of Cu.B.'s therapist.

On June 6, 2022, Cu.B. was discharged from Harborcreek Youth. He was placed in a foster home on Harborcreek Youth's recommendation because of Mother's continued noncompliance and the fact that her paramour, F.C., was still in the home and the Children were afraid of him. While in foster care,

Cu.B. had one visit with Mother, after which he egged the foster family's home, cut their furniture and fought with the other children in the home. Soon thereafter, the foster family requested Cu.B.'s removal. On August 29, 2022, he was moved to the Pathways Adolescent Center. Ms. Sallack witnessed one visit between Cu.B. and Mother and said it was "really weird" because neither spoke. (N.T., at 29). Cu.B. told Ms. Sallack that he was angry with Mother for always choosing F.C. over the Children.

**2.**

At the time of the hearing, 12-year-old Ca.B. had been in care for 15 months, *i.e.*, since July 23, 2021. From the time he was born until he was placed, there were 34 CYS referrals on the family. He was hospitalized at Dubois Penn Highlands from June 25, 2021, until July 2, 2021, and again on July 15, 2021, for mental health/behavioral issues. He was adjudicated dependent on July 23, 2021, based on the CYS allegations of him inappropriately touching his sister, Ch.B., frequent inpatient stays, aggression toward the family, Mother's noncompliance with his mental health and him being inpatient during the adjudication.

He was placed at Pathways Adolescent Center on July 28, 2021, after he was discharged from Dubois Penn Highlands. He moved to George Junior Republic group home for the diagnostic youth residential program from August 18, 2021, until he was placed with a foster family on November 12, 2021. While at George Junior Republic group home, he had zoom visits with Mother.

Ca.B. failed to make any progress after he was discharged. CYS recommended individual therapy with Jenn McDonald and he has been doing well with talking through some of his trauma. Ca.B.'s anxiety goes up after visits with Mother, with him confused and fearful due to Mother choosing F.C. over the Children. She is also inconsistent with her calls, with Ca.B. waiting for them and then getting very upset when she fails to telephone. After not having seizures for years, he had two seizures the night before his Child Advocacy Center (CAC) interview at which he was going to be discussing an incident that had occurred involving Father. When Mother was told about the seizures, she texted the foster mother, telling her that she would call Ca.B. to check on him that night. She never called and has not done so since then. Because of Ca.B.'s (and Ch.B.'s) struggles after seeing Mother, the court suspended contact on October 13, 2022.

Like with Cu.B., Father was restricted from having contact with Ca.B. as a result of trauma he had inflicted on him. Father's only contact with him during the 15 months since he was placed in care on July 23, 2021, was one letter and an instance where he saw him in court. Upon receiving the letter, Ca.B. was reluctant to open it, and when he did, he suffered nightmares from which he would wake up crying and concerned about the safety of his foster family. He experienced the same nightmares after seeing Father in court.

Ca.B.'s foster mother, L.K., testified that Mother only called him three times over 11 months, but that she consistently attended her weekly two-

hour visit with him and, if he were sick, she would Facetime with him. Ca.B. loves going to visits with Mother but when he returns to the foster home he is very distant and angry for a couple of hours, questioning why Mother will not leave F.C. for him. He has medication for concentration and sleep that she has been able to wean him off, but whenever he has to go to court, he must start on it again because he has nightmares from seeing Father and F.C. He is doing very well in school, has friends like he never had before and plays sports. L.K. said that Ca.B. needs something final because he is so worried all the time about people taking him away from their home and placing him somewhere else. She added that he loves his parents but he has said he wants to stay with L.K. and his foster family.

**3.**

The youngest child, ten-year-old Ch.B., was adjudicated dependent for the third time on April 21, 2022, and had been in care for a total of ten months over the life of the case and six months at the time of the goal change hearing. The basis for the adjudication included hygiene issues observed at school, her failure to receive prescribed medication, tardiness at school and concerns that Mother's paramour, F.C., was withholding food and mistreating her. Ch.B. suffered seizures in October 2020 and Mother was to schedule a follow-up appointment, but she failed to do so. Ch.B. was in kinship care with L.C. since May 2022 and L.C. took her for follow-up on May 23, 2022. Although briefly moved to foster care, since June 2022, Ch.B. has been with another kinship

care family where she has two half-siblings and one step-sibling. She is in trauma therapy with Jenn McDonald at Rooted Counseling.

Ch.B. is on a wait list for anxiety medication, but there has been an improvement since visitation with Mother stopped. Ch.B. was having behavioral issues after her visits with Mother, including urinating, defecating in her pants and getting aggressive with other children in the kinship home. If Mother failed to make a scheduled phone call, Ch.B. also got very nasty with her siblings in the home. After the October 13, 2022 hold was put on Mother's visits, the foster parents have not reported any significant behaviors with Ch.B. and have noticed remarkable changes in her. Since having no contact with either parent, she is doing well in school.

Prior to June 2022, Ch.B. visited with Father every other weekend. However, she suffered incontinence, anger, nightmares and sexualized behaviors (characterized as digging at her vagina) after visits with him. On September 14, 2021, licensed psychologist, Dr. Allen H. Ryen, performed a bonding assessment that included Ch.B., Mother and Father.

Dr. Ryen noted that Ch.B. "had almost no information to volunteer about her natural family, either spontaneously or in response to open-ended questions," but she did state that she likes her foster home and foster parents, that she is well taken care of and safe and volunteered that she is "going to stay there forever.'" (Dr. Ryen Bonding Assessment, §§ 3-5). He observed that "disruptions of primary and secure emotional attachments have negative

implications for child development" and that the maternal bond was "weak and insecure" because although Ch.B. was comfortable with Mother, "her feelings were ambivalent and conflicted." (***Id.*** at 2, 7); (N.T., at 55, 56). Ch.B. had "at least some level of secure bonding and dependency" with Father, but Father's "long absences from his daughter's life have had an impact [on] her current adjustment and well-being[.]" (Dr. Ryen Bonding Assessment, at 7); (N.T., at 57). Dr. Ryen reported that Ch.B. "has experienced a great deal of instability, neglect, abuse, and trauma in her life," and that "any problems she may be experiencing are very much traumatic in origin." (Dr. Ryen Bonding Assessment, at 7). "[Ch.B.] continues to experience nightmares, and to act out physically and sexually following contact with **either** of her natural parents. These observations have been reported by school and agency personnel, in addition to the foster parents." (***Id.*** at 7-8) (emphasis in original). Dr. Ryen noted that Ch.B. "appears to have been sexually victimized, at least by her older siblings, and perhaps by numerous others." (***Id.*** at 8). Ch.B. is decompensating, whether it be from ongoing trauma or other unidentified family issues. He recommended that this be addressed in ongoing family therapy at the direction of her primary therapist, although the source of the trauma might not be sexual in nature because "emotionally deprived and neglected children are also known to act out sexually in some circumstances." (***Id.***). Ultimately, he opined, "it is not in [Ch.B.]'s best interest to experience whatever stimuli that may be provoking or producing

these abreactions, and their ongoing occurrence would argue for restricted family contacts, or even elimination of such contacts in favor of adoption or open adoption." (***Id.***). Although Dr. Ryen considered "a goal change to adoption to be premature at this point in time," he added that "stable permanency options for [Ch.B.] must soon be given primary consideration." (***Id.***).

Kyle Straub of Core Psychiatric and Psychological Services testified that he worked with Ch.B. from March 22, 2022, until July 21, 2022. He testified about her various temperament changes, her fear of F.C. and the fact that she seems confused and needs stability, whatever decision is made.

Ch.B.'s foster mother, C.J.B., testified that Ch.B. has lived with her since June 27, 2022, and that, by that time, visits with Father had already stopped. She said that Ch.B. is excited for visits with Mother, but when she returns, she has a lot of anger and will urinate and defecate in her pants and is mean to the other three children who live in the home and at school, hitting, biting and arguing with them. Mother attended the weekly two-hour visits with Ch.B. until they were suspended on October 13, 2022. She also was supposed to call once a week but had not done so since August 13, 2022, which upset Ch.B., resulting in her physically abusing other children in the home, even putting another child in the hospital by slamming a door on his head when Mother did not call for two weeks. Ch.B. would get angry that Mother "loved [F.C.] more than she loves me." (***Id.*** at 120). Since Mother's visits were

suspended, Ch.B. has had none of the behavioral issues, except urinating in her pants one time when she thought there was going to be a visit with Mother. C.J.B. said Ch.B. needs stability and the school agrees.

Ms. Sallack stated that Father has verbalized he is not willing to give up on Ch.B., and that the interaction between him and Ch.B. is good. However, she also noted that Father does not see Ch.B.'s reaction after the visits, the negative behaviors and issues at school, the decline in her mental health or her urinating accidents. She noted that Father told her that he just wants the Children "to flourish," and although he would prefer that to be with him, he knew that might not happen. (***Id.*** at 59).

Ultimately, Ms. Sallack opined that even though there might be some bond with Father, Cu.B. had been in placement for over two years, Ca.B. for 18 months and Ch.B. for a combined total of ten months, and that the level of trauma they experienced is "not going to be unpacked in months." (***Id.***). There is no bond with Mother because she has "been detached all along." (***Id.*** at 60). CYS recommended the Children remain in their current placements with medical and educational remaining with CYS, a review in six months and a goal change to adoption.

**B.**

**1.**

Davis, the coordinator of the boys' program at Pathways Adolescent Center who worked with Cu.B., testified on Father's behalf. He stated that he

believed it "would not hurt" to have some family involvement. (***Id.*** at 21). Cu.B. said that one of the things that upsets him is not having family involved, but he has not expressed in what form he wants that or exactly to whom in his family he is referring. He enjoys talking with his brother Ca.B. on the phone and wants "someone to talk to, communicate with." (***Id.*** at 23-24) He calls Mother, but she does not pick up the phone, and Smith left weekly telephone messages for her, but she does not return the calls. There had been no involvement by either Mother or Father since Cu.B. was placed in Pathways Adolescent Center on August 29, 2022.

**2.**

Father testified on his own behalf. He stated that he tries to fully cooperate with CYS to do whatever he has to do to have a relationship with his Children. He completed the FIT program to learn about what molested children go through and recognize the signs of molestation. He took the parenting class three times. CYS scheduled him for a psychiatric evaluation for December 1, 2022, that he intended to attend. Dr. Ryen had recommended a psychosexual evaluation that Father said he was willing to attend if CYS could assist with paying for it. He said he does not agree with the recommendation that contact Ca.B. And Ch.B. be subject to therapists' opinions because he wanted to be able to talk to, hug and play with them, but he would do whatever he had to do to start the process of reunification. He

testified that he does not believe the Children's trauma is as bad as others had testified.

As to the bonding assessment, he said Dr. Ryen mentioned in the report that Father painted Ch.B.'s nails, played games and read, things Father characterized as "normal stuff dad's do." (***Id.*** at 131). Father added that they also do things like color, go to the park and ride bikes and that weekend visits with Ch.B. began and ended with appropriate affection like a hug or kiss. Father said things were going very well with CYS until there suddenly was a CPS report that was unfounded a week later. Since then, Father has not had contact with the Children, but he wants contact with them in whatever way is allowed. He acknowledged that their past was not "the best," and that he is going through PTSD therapy and would participate in any family therapy, trauma therapy or whatever was recommended for the Children. He said he believes it would not be in the Children's best interest to change the goal to adoption because they need their parents, even if it starts with a little and grows from there.

On October 26, 2022, the trial court determined it was in the Children's best interest for their permanency goals to be changed to adoption. Father timely appealed and filed a statement of errors.[7] ***See*** Pa.R.A.P. 1925(a)(2)(i).

---

[7] Our standard of review of this matter is well-settled:

**III.**

**A.**

Placement and custody issues are governed by the Juvenile Act, 42 Pa.C.S. § 6301-6365. The policy underlying the Juvenile Act:

> is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, … the Juvenile Act … place[s] the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

***In re N.C.***, 909 A.2d at 823 (citation omitted; emphasis in original).

At a permanency review hearing, a trial court is statutorily required to consider:

---

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

***In re N.C.***, 909 A.2d 818, 822-23 (Pa. Super. 2006) (citations and quotation marks omitted).

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and a likely date by which the goal for the child might be achieved.

***Id.*** (citation omitted); ***see*** 42 Pa.C.S. § 6351(f). The focus of "goal change proceedings, is on the safety, permanency, and well-being of the child and the best interests of the child must take precedence over all other considerations." ***Interest of H.J.***, 206 A.3d 22, 25 (Pa. Super. 2019) (citation omitted). If reunification with a child's parent is not in a child's best interest, the court may determine that adoption is the appropriate permanency goal. ***See*** 42 Pa.C.S. § 6351(f.1)(2). "When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home." ***Interest of H.J.***, 206 A.3d at 25 (citation omitted). "A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." ***Id.*** "A placement goal change to adoption does not terminate the parents' rights; however it is a step in that direction." ***Id.*** (citation omitted).

**B.**

Father concedes that the family history is long and that at the beginning of the Children's placement, he was "non-compliant and difficult." (Father's Brief, at 9); (***see id.*** at 8). He also admits that each of the Children has

exhibited "signs of past trauma that has hindered reunification efforts." (***Id.*** at 9). He maintains that based on "the circumstances referenced above, clearly an argument for a goal change is easily supported," but, "when considering all factors a court is to consider, the argument [to] maintain[] a goal of reunification makes sense."[8] (***Id.***). We disagree.

In its December 12, 2022 opinion, the trial court explains:

> In light of the credible evidence, the court does not deem reunification with Father to be a viable goal for the children either now or in the near future. Since January of 2020, his contact with Cu.B. has been limited to 2 Zoom visits, and with the exception of 1 letter, he has not attempted to communicate with Ca.B. outside of the courthouse, which means that any efforts toward reunification at this point would have to begin with the most limited, getting-to-know-you types of activities and progress from there. Yet the witnesses and treatment records reflect that Ca.B. is demonstrably afraid of Father even now and that both boys' past trauma, an undetermined portion of which is attributable to Father, would necessitate an extended course of individual and family therapy before the court would even consider returning them to Father's custody. That does not comport with the dictates of the Juvenile Act or the best interests of the children.

---

[8] As noted previously, "[w]hen the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result." ***In re N.C.***, 909 A.2d at 822-23. Therefore, Father's concession that the record supports the goal change argument in effect concedes that the decision should be affirmed. His argument asks us to reweigh the evidence, highlighting the evidence of his progress and bond with Ch.B. and utterly ignoring all the negative testimony about his effect on the Children. It was within the province of the court to make credibility determinations and accept all, some or none of the evidence. ***See id.*** Therefore, his argument fails. Moreover, as explained above, our review of the record supports the court's decision.

While it may seem less obvious based on a superficial review of the record, the goal change was equally appropriate with respect to Ch.B.

Like her brothers, Ch.B. has been subjected to a great deal of trauma with uncertain origins. It is true, of course, that the Agency was prepared earlier this year to return the girl to Father's custody, and in light of Dr. Ryen's observations, the Court can hardly say that the two do not share a bond. It is equally true, however, that Father cannot be excluded as one of the sources of his daughter's trauma. (***See*** CYS Exh. 13 (Ryen Report), pp. 7-8). The credible evidence indicates, moreover, that contact with Father engenders negative behaviors in Ch.B. that include aggression, incontinence, nightmares, and abnormal sexual responses, *e.g.*, digging at her vagina. That being the case, reunification is not a near-in-time possibility. On the contrary, Dr. Ryen's report suggests that it would take far longer than the Juvenile Act prescribes. …

(***See id.*** at 8). Dr. Ryen goes on to say that a goal change would be premature but adds that "stable permanency options for this child must soon be given primary consideration." (***Id.***) He further recommends psychological evaluations for both parents and psychosexual evaluations for Father and Mother's boyfriend, thereafter concluding, "The presence of undetected or unaddressed personal problems for any of these family members may well hold the key for Ch.B.'s future." (***Id.***).

The course of treatment Dr. Ry[e]n recommends clearly cannot be completed in a short period of time. Additionally, Father's refusal to believe what the experts and laypersons closest to his children report about their trauma and behaviors, combined with his belief that he knows best since he is their father, (***see*** N.T., 10/26/2022, at 140-41), bodes poorly for the idea that he would fully cooperate with a treatment plan best suited to unravel and address the causes of the children's psychological trauma. That is not to discount Father's commendable progress over the last 2 years. Once again, however, it is the children's best interests that must be given primary consideration here.

The Court would add that it has not failed to consider how the children might be affected by the goal change. In that regard, the testimony and exhibits consistently reflect that all three have shown substantial improvements since being removed from

> Father's care and that Ca.B. and Ch.B. notably regress after having contact with him. The only one to have demonstrated any affection toward Father, moreover, Ch.B.[,] has indicated that she wants to stay at her foster home, (***see id.*** at 55-56); has not asked about seeing Father even while in transit for visits with Mother, (***see id.*** at 74-75); and continues to show distinct improvements when he is not around. (***See id.*** generally). Meanwhile, Cu.B., though he wants to be part of a family, has never indicated a desire to communicate or go home with Father, (***see id.*** at 23-24 & 83), while Ca.B. is affirmatively afraid both of Father and of being removed from his current foster home. (***See id.*** at 112-14). The court is thus satisfied that the children will not be adversely affected by its decision, which it respectfully submits is substantiated by the record and should be affirmed.

(Trial Court Opinion, 12/12/22, at 1-3) (unnecessary capitalization omitted; record citation formatting provided).

We discern no abuse of discretion. CYS has provided numerous services for the family since 2008. (***See*** N.T., at 4, 9, 38, 53-54, 92); (CYS Exhibit 12, List of Services Provided). While at the time of the hearing Father was in full compliance with the permanency plan and had made moderate progress toward alleviating the circumstances that necessitated the original placement,[9] this only shows part of the picture.

It can be reasonably inferred from the testimony that Cu.B. and Ca.B. have no bond with Mother and Father. (***See*** N.T., at 16, 31, 35, 37, 52, 110, 113-16, 137-41). Despite Father's allegation that he is not permitted to see

---

[9] Mother had moderate compliance with the permanency plan and had made minimal progress in alleviating the circumstances necessitating the original placement where part of the circumstance necessitating the placement was her paramour, F.C., and she refused to address this.

Cu.B. and Ca.B., this is misleading because it is due to the trauma he has caused them. He would have been permitted to see them on the recommendation of their therapists, but because of the trauma and Cu.B. and Ca.B.'s requests that they not be required to see him, the therapists have not recommended the contact. (***See*** N.T., at 24-25, 31); (CYS Exhibit 3, Harborcreek Report, 10/08/21, at 2-3).

Additionally, although he was precluded from seeing Ch.B. after the CPS report in June 2022, when it was unfounded, he made no attempt to see her until immediately before the October 26, 2022 hearing. (***See*** N.T., at 53). Although Ch.B. has some bond with Father, she does not ask for him and expressed her intent to stay with her foster parents forever since they keep her safe. (***See id.*** at 56-58); (CYS Exhibit 13, Dr. Ryen Bonding Assessment, at §§ 3-5). Ch.B.'s maternal bond with Mother is "weak and insecure" and, since not seeing Father since June/July 2022 and Mother since October 13, 2022, her behavior has greatly improved. (CYS Exhibit 13, Dr. Ryen Bonding Assessment, at 7). Cu.B. and Ca.B. have an angry or nonexistent relationship with Mother where she refuses to make any changes in her life with F.C. to allow for reunification and does not maintain consistent contact with them. (***See*** N.T., at 35-36).

All of the Children suffer inappropriate behavior, nightmares, bed wetting and fear after spending time with either parent, resulting in court orders precluding contact. (***See id.***, at 31, 35-36, 52-53, 60, 72, 76-80, 110-

11, 150); (CYS Exhibit 2, Harborcreek Report, 10/17/20); (CYS Exhibit 13, Dr. Ryen Bonding Assessment, at 7-8); (Order, 10/13/22, at 1).

Ms. Sallack opined that even though there might be some bond with Father, Cu.B. had been in placement for over two years, Ca.B. for 18 months and Ch.B. for a combined total of ten months, and that the level of trauma they experienced is "not going to be unpacked in months." (N.T., at 59). There is no bond with Mother because she has "been detached all along." (***Id.*** at 60). As Ms. Sallack stated, CYS was seeking a goal change, not because of a lack of a bond, but because of the severe behavioral issues that occur after contact and the fact that the Children have been dealing with stress and trauma their entire lives. (***See id.*** at 75). CYS recommended the Children remain in their current placements with medical and educational remaining with CYS, a review in six months and a goal change to adoption.

The record reflects that the Children have been in multiple facilities and foster homes, fear Father and suffer behavioral issues after the interactions they have had with him and Mother. Reunification is not an appropriate placement goal for the Children and it is not in their best interests.

We note briefly that Father focuses on the facts that the Pathways Adolescent Center program coordinator Davis testified that he believed family involvement could be important for Cu.B. because he wanted it. (***See*** Father's Brief, at 9). However, a review of the record shows that Davis did not know to whom Cu.B. was referring, and he just wanted someone to talk to and with

whom he could communicate. Father also notes that at the time of his assessment, Dr. Ryen stated that a goal change for Ch.B. would be premature and that there was a loving bond between Father and Ch.B. (***See*** Father's Brief, at 10). However, Dr. Ryen also reported that Ch.B. has suffered severe trauma from a very young age and stated she likes her foster home, and that her foster parents "take very good care of [her] and keep [her] safe" and she volunteered, "I am going to stay there forever." (N.T., at 56). According to her foster parents and school and agency personnel, after Ch.B. has contact with either of her parents, she experiences nightmares and acts out physically and sexually and it is unclear whether this is caused by ongoing trauma, re-traumatization or other unidentified personal or family dynamics. Until the cause can be determined through extensive therapy, Dr. Ryen recommended restricted parental contact or a goal change to adoption in the near future to provide her with necessary stability. (***See id.*** at 58).

It was for the trial court to evaluate witness credibility and resolve any conflicts in the above testimony. What is undisputed is that the Children have suffered some or all of their trauma due to Father and their behavioral issues present after contact with either Mother or Father. The Children have been in and out various homes their whole lives, and it is in their best interest that they have a stability that cannot be established with a goal of reunification. Under our standard of review, we cannot conclude that the trial court's decision was manifestly unreasonable where its findings of fact are supported

by competent evidence of record, even if some evidence could support the opposite result. Therefore, we affirm the court's orders changing the permanency goal for the Children to adoption.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/15/2023